562 So.2d 1199 (1990)
Albert Freddie CARRAWAY
v.
STATE of Mississippi.
No. 07-KA-58751.
Supreme Court of Mississippi.
April 18, 1990.
Clarence R. Scales, Scales & Scales, Percy S. Stanfield, Jr., Stanfield Carmody & Coxwell, Jackson, for appellant.
Mike C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and ANDERSON, JJ.
ANDERSON, Justice, for the Court:
The appellant, Albert Freddie Carraway [Carraway] was convicted in the Circuit Court of Hinds County of manslaughter and sentenced to a term of twenty years' imprisonment in the Mississippi Department of Corrections. He properly perfected his appeal and is now released on bond pending appeal. In his appeal to this Court, Carraway assigns five issues; however, only one has merit, and it is discussed below.

STATEMENT OF THE FACTS
This case involves a three vehicle collision resulting in the death of Ben Willie, one of the drivers. Carraway drove a mid-1970 Torino station wagon. The decedent drove a green 1964 Chevrolet pickup truck, and the third driver, Don Smith, drove a black 1979 F10 Ford Pickup. The proof as to who initiated the accident was a question for the jury, and they found that Carraway was the culprit. After reading the lengthy trial transcript, covering numerous witnesses in the six day trial, we believe the evidence was overwhelming as to Carraway's guilt, and the jury made the proper decision.
The state presented evidence through several witnesses who were involved in the accident in various capacities. The least contradicted evidence was that the accident occurred on Mississippi Highway 18, a two-lane highway, approximately three miles west of Raymond between 6:00 and 6:30 on the night of January 11, 1986.
Michael Bates, Willie's stepson, was a passenger in the 1964 Chevrolet pickup truck driven by Willie. He sat in the middle between Willie and Bruce Driskell as they were returning home to Pearl after a hunting trip at Bayou Pierre between Utica and Carlisle. They had placed their guns and ammunition in the cab of the truck.
*1200 As they were travelling, Bates saw the lights of an oncoming vehicle in their lane of traffic. The next thing he heard was brakes squealing, a loud boom and he then saw fire. He did not know if a second vehicle had hit them from behind. He remembered hitting the ground outside of the truck, but he was unaware how he had gotten there. As he lay on the ground, he heard bullets being fired. Two men rescued him and an ambulance took him to the hospital. Bates suffered burns to the left side of his body  face, hands, arm, shoulder and across the back.
Larry Helmick and his brother, Ronnie, were also returning from a hunting trip, travelling at approximately forty-five to fifty miles per hour while Smith, immediately ahead of them, drove fifty to fifty-five miles per hour. Once they reached the top of the hill, Larry saw headlights heading west in the east-bound lane. The lights came from the station wagon driven by Carraway. The car hit Willie's truck headon turning it sideways and causing a fire to erupt under the hood which spread to the left fender.
Larry saw Smith attempt to avoid the accident by going to the right shoulder of the road; however, because of the initial collision, Willie's truck was moving backward and collided with Smith's truck.
After seeing the accident, the Helmick brothers got out of their car to give assistance. Larry went to the station wagon and opened the passenger side because he was unable to open the driver side. As he opened the door a beer can fell from the car. Other beer cans were scattered about the car, and the car smelled of beer. He checked Carraway for injuries, but Carraway appeared to be fine other than being intoxicated, and Carraway appeared to not know what he was saying or doing. During this time Ronnie was joined by Smith, and they pulled a boy [Bates] from the burning pick-up.
Larry did not go near the truck until the flames had been extinguished because he heard .22 shells exploding. He eventually went to the truck and saw Willie halfway out the door on the driver side. Willie was dead and badly burned.
Don Smith also testified for the state. Smith, a member of the Jackson Fire Department, had also been hunting, and he and his son were travelling east on Highway 18 returning to Jackson. He was driving between forty-five and fifty miles per hour in a 1979 F10 Ford pickup. He had been following Willie about three or four car lengths for fifteen to twenty minutes when he saw headlights coming down the east-bound lane and cross the center lane  heading west in the east-bound lane. These headlights came from Carraway's station wagon.
Willie applied his brakes and attempted to pull to the shoulder of the road. Smith reacted in time and immediately applied his brakes and went to the shoulder of the road. Willie, however, was unable to avert the head-on collision. His truck was spun around and knocked backward into Smith's truck. Likewise, after the initial collision, the station wagon began spinning in circles and came to a rest some fifty to one hundred feet behind Smith's truck.
Once Willie's truck collided with Carraway's car, flames erupted under the engine compartment and left wheel well of the pickup. The fire was concentrated in the area midway of the cab to the driver's side. Smith's truck hit Willie's at a point immediately forward of the driver's door. When all the vehicles had come to a complete stop, Smith and his son exited their truck on the driver's side.
By that time, Smith heard cries for help coming from the burning truck, and he and the Helmicks went to aid the victims. Bates' hair and clothing were on fire when Smith and Ronnie pulled him from the car, extinguished the blazes and took him across the street. Larry had already left to go to Carraway's car. Smith and Ronnie went back to the truck to get Willie, but the flames were too intense.
According to Smith, the highway patrolman arrived about fifty-five minutes after the accident to investigate. When he arrived, the officer gave Smith a legal pad and told him to write down what happened. *1201 He never asked Smith any questions, and Smith did not see him take a statement from the Helmicks. Smith never saw the officer take any measurements of skid marks.
The state's next witness was Hugh Trussell. On the night of the accident, he administered a DUI test to Carraway. Carraway had a blood alcohol level of .225  more than twice the level necessary to be under the influence of alcohol. He was intoxicated and smelled of alcohol.
The state's final witness was an expert, who described how the fire started and the intensity of the flames.[1]
Now turning to the appellant's theory of the case, we only have to look at the testimonies of three witnesses to appropriately discuss Carraway's assigned error.
Officer R.O. Williams of the Mississippi Highway Patrol testified that he received a call regarding an accident on Highway 18; but, there was no indication that there were injuries. He received the call at about 6:15 p.m. and arrived at the accident at about 6:50 p.m. During his investigation, he took pictures and talked to witnesses, including Smith and Driskell, and the other officers on the scene.[2] Because the fire truck had been there to extinguish the blaze, there were no visible skid marks.
Smith wrote out two statements for Williams. One statement indicated that Smith had attempted to pass the vehicle in front of him [Willie's], but he decided to drop back. According to Smith's statement, he then saw a vehicle come over the hill and hit Willie's vehicle. It knocked Willie's truck into his truck causing Willie's truck to erupt into flames. On cross-examination, however, Williams testified that Smith did not say at what point during his travelling did he attempt to pass Willie.
According to the officer, he took two written statements from Smith.[3] In addition, Williams contended that he took statements from Driskell and Bates, but he was unable to get one from Hancock. He made all this information available to the district attorney.
Carraway testified in his own behalf, probably providing the most damaging testimony. He drinks between six and eight beers daily. At the time of the accident, his license had been suspended from January 1984 to March 1987, as a result of having been convicted for DUI twice within a month. Carraway would never drink on the job; however, on the day of the accident he did not have to work.
As early as 9:00 a.m. that morning, he began drinking beer. By 4:30 that afternoon he had drunk between four and five beers. He went to a bar and remained there until about 6:00 p.m. During that period he drank between three and five beers. This was about the same amount of beer he would drink daily, and he felt no effects.
Carraway left the bar and headed towards Raymond  west on Highway 18. He had driven between four and five miles at approximately fifty-five mph when he was involved in the accident. He maintains that as he was coming out of a curve approaching a hill he saw four headlights  two in his lane and two in the other lane. He hit his brakes trying to stop but then *1202 there was the collision causing Carraway to bruise the right side of his face and sustaining a cut above his right eye and breaking three ribs.
Carraway testified that after the accident, he talked to Smith, who admitted causing the wreck. He insists that Smith caused the accident because Smith was trying to pass Willie.
The only other significant testimony for the defendant came from his expert witness, H. Hibbett Neel. He concluded that it was unlikely Carraway's vehicle pushed Willie's vehicle into Smith's truck. In his opinion, Mr. Smith was following too closely, but he also admitted that Carraway's drinking could contribute to the wreck just as his riding in the wrong lane would be a contributing factor. Moreover, he also stated that Carraway indeed caused the first impact, caused the wreck, and but for the initial impact, the second would not have occurred.
Neel never did an on-scene investigation after the accident, and he simply relied on physics and engineering theories to support his conclusions. Neel concluded that Carraway was in the wrong lane of traffic at the point of impact. He says that both the defendant and Smith caused the wreck, and, he found nothing at the scene of the accident consistent with Smith passing Willie.

PROPOSITION I

THE COURT ERRED IN REFUSING TO ADMIT INTO EVIDENCE A STATEMENT MADE BY A WITNESS FOR THE STATE IN CROSS EXAMINATION MADE SHORTLY AFTER AND AT THE SCENE OF THE ACCIDENT.
Prior to trial Carraway filed his Motion to Compel All Evidence Favorable to Defendant. This motion in part requested that the state produce for copying or inspection "all evidence in the possession and control of the state" that may be favorable to Carraway and material to his guilt or innocence.
During the first day of trial, Don Smith testified for the state. His testimony was interrupted by the lunch break. He testified that he wrote a statement for the highway patrolman. After the lunch break and during cross-examination, Smith denied making two statements. At that moment defense counsel sought to admit a written statement and question Smith concerning that statement, but the prosecution objected. The prosecution objected because this statement had not been included in the information requested during discovery. In explaining why the statement was not included with the requested material, the defense maintained that they had no knowledge of the statement until Officer Williams gave it to them during the lunch recess. The trial judge allowed the second statement to be marked for identification, but he sustained the state's objection to its use or any reference of it made by defense counsel.
During the defense's redirect examination of Williams, the prosecution again objected to any reference to the second statement. Outside the presence of the jury, the trial judge allowed counsel to discuss the evidence. Williams stated that he did take the statements but did not make them a part of his report. Williams, however, did make those statements, as well as the statements taken from Driskell and Bates, available to the district attorney within two weeks of the accident. In addition, Williams explained that the first time he told the defense lawyers about the statements was a few hours earlier during the lunch hour. Again, the court sustained the prosecution's objection.

DISCUSSION OF LAW
What we have before this Court today is a twist on the usual circumstances involving Unif. Circuit Court Criminal Rule 4.06. Here we have the prosecution objecting to testimony that the defense has discovered from an agent of the state. The state maintains that Carraway at least should have informed the trial judge of this newly discovered evidence before he attempted to admit it during Smith's cross-examination. *1203 This is so although the state had kept this evidence from the defendant.
This Court has outlined the following procedures that the trial court should take when confronted with a 4.06 violation:
1) Upon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.
2) If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.
3) If the defendant does request a continuance the State may choose to proceed with trial and forego using the undisclosed evidence. If the State is not willing to proceed without the evidence, the trial court must grant the requested continuance.
Cole v. State, 525 So.2d 365, 367 (Miss. 1987) (quoting Box v. State, 437 So.2d 19, 23-4 (Miss. 1983) (Robertson, J., specially concurring)). See also Griffin v. State, 504 So.2d 186, 195 (Miss. 1987). This same procedure must be used when the state objects to testimony because of a defendant's violation. Darghty v. State, 530 So.2d 27, 33 (Miss. 1988). Consequently, when a defendant offers evidence that he should have otherwise disclosed, it cannot be rejected out of hand. The state must go through the same steps that a defendant would when he is confronted with evidence that was not disclosed by the state. Id.
In Darby v. State, 538 So.2d 1168, 1176 (Miss. 1989), however, we modified the position that we took in Darghty, supra. If the state does not request a continuance, the trial court may exclude the undisclosed evidence. But, we emphasized that the state is subject to this exemption only when the defendant's discovery violation is "willful and motivated by a desire to obtain a tactical advantage." See also Taylor v. Illinois, 484 U.S. 400, 415, 108 S.Ct. 646, 655, 98 L.Ed.2d 798, 814 (1988); and Hall v. State, 546 So.2d 673, 677 (Miss. 1989).
So that the bar can be informed (or warned) of what we consider willful violations, we must turn to Darby. The evidence in that case was uncontroverted that the violations were willful. This Court found that the prosecution in Darby had contacted defense counsel to see if he had been provided with all discovery he needed in order to represent the defendant. 538 So.2d at 1175. Defense counsel refused to accept a list of witnesses to be called by the state. He believed that because he refused the state's list he did not have to produce a list. Id. This resulted in a deliberate violation of 4.06, but the trial court allowed all but one of the defense witnesses to testify. The court excluded the one witness' testimony because his name was not on the list given to the State by Darby's counsel "even after the trial court held a hearing on the State's motion to exclude defense witnesses for Rule 4.06 violations." Id.
In finding that the trial court committed no error in excluding the testimony, this Court expressly limited "[the] holding to the cases in which the violations are intentional and this opinion [was] in no way intended to compromise our law regarding the procedure set forth in Box ... and Cole ..." Id. at 1177.[4]
A more recent case dealing with this issue is Hall v. State, 546 So.2d 673 (Miss. 1989). In Hall, the defendant attempted to introduce a baseball uniform, but the state objected on the grounds that pursuant to Rule 4.06, they had not been notified that a uniform would be introduced. Id. at 676. The trial court excluded the uniform but allowed a proffer.
On appeal the defendant asserted that the uniform should not have been excluded but the proper remedy was a continuance. *1204 Id. In addition, he argued that exclusion of the uniform was not necessary because the state was aware of the existence and general description of the uniform, and therefore, the state was not surprised by Hall's effort to have the uniform admitted into evidence. Moreover, Hall asserted that the uniform was essential to his defense because a prosecution witness' identification was based on a picture taken after his arrest instead of on events of the night when the transaction occurred. Id.
In explaining our decision we looked to Houston v. State, 531 So.2d 598, 612 (Miss. 1988), where we emphasized that "the radical sanction of exclusion of a substantial portion of the defendant's evidence is one that rarely should be used." 546 So.2d at 677. Moreover, exclusions are justified and should be reserved for "cases in which the defendant participates significantly in some deliberate cynical scheme to gain a substantial tactical advantage." Id. (quoting Houston, 531 So.2d at 612).
In keeping step with our prior decisions, we held that the uniform was wrongfully excluded. The state should have moved for a continuance and proceeded according to the steps outlined in Box and subsequent decisions. Although we did find error, we did not reverse because the error was harmless. 546 So.2d at 677. See also, Porter v. State, 551 So.2d 104 (Miss. 1989) (Evidence of guilt was overwhelming and more than sufficient to sustain the jury's verdict; therefore the failure to provide defendant with witnesses' earlier statements was harmless).
Now turning to the case sub judice, contrary to what the state argues, this undisclosed statement was always in its custody. Officer Williams, a Mississippi Highway Patrolman, had the statements in his custody, and he testified that he made the information available to the district attorney. Whether the district attorney actually held or even touched the document is irrelevant. The state had custody of the document because a member of its investigating team had it in his possession. To hold otherwise would give prosecuting attorneys significant room to violate our discovery rules.
In a perfect world the prosecution and defense will follow to the letter all of the rules. Therefore, in this case, when the defendant first received this information from the patrolman, he should have stopped eating lunch and informed the judge and the prosecuting attorney about the newly discovered evidence and then proceeded according to our rules. We realize, however, that this is not a perfect world and court proceedings are far from perfect.[5] Consequently, we allow flexibility in our rules.
There are at least two reasons why we cannot put Carraway at complete fault in not coming forward with newly discovered evidence. First, very little time had elapsed when the defendant received the information and when he attempted to admit the evidence. Secondly, the state had this evidence although the prosecution was unaware of its existence.
On the two occasions when Carraway attempted to introduce the evidence, the state properly objected. The trial court acted properly in excusing the jury and allowing the state to become familiar with the evidence. Once the state became familiar with it, and the prosecutor believed that it would still be prejudiced by it because of a lack of opportunity to prepare to meet the evidence, he should have requested a continuance. Darby, 538 So.2d at 1176. He could not rely on the Darby exemption because it is neither obvious that Carraway withheld the evidence only to ambush the state nor can his infraction be deemed willful and calculated to gain an advantage. Cf. Moore v. State, 536 So.2d 909, 910-11 (Miss. 1989) (Obvious that the state made a decision to use evidence and still failed to notify defendant when it turned over statement to defendant shortly before selection of the jury).
*1205 During both times that the defendant attempted to present the evidence, the state failed to "utter those rabbit's foot words `I move for a continuance.'" Darby, 538 So.2d at 1178 (Hawkins, Lee, D., P.JJ., and Sullivan, J., dissenting in part and concurring in part).[6] There is no doubt that the state should have done this. Since the state did not speak these magical words, the trial judge should not have excluded the evidence. But, without doubt, the error was harmless.
The evidence was overwhelming that Carraway initiated the collisions. There is no doubt that he was drunk. The only evidence to the contrary is his testimony indicating that he drank the same amount of beer daily with no adverse effects. In his testimony, he states that he saw four headlights. This is conceivable. Because of his intoxication, it is also conceivable that he saw six or eight lights or saw nothing at all. When this testimony is considered with the testimony of the other witnesses, including his expert, that Carraway caused the accident, then we have to accept the jury's verdict because the outcome would have been the same. Moreover, after reviewing the statement, we believe that there is nothing in it that discredits or impeaches Smith's testimony. More importantly, nothing in the statement exculpates Carraway in any way.
This case has provided another opportunity for us to struggle with Rule 4.06. We regret the inconsistencies. See, Tanner v. State, 556 So.2d 681 (Miss. 1989). But, this case in no way should be interpreted to allow any whittling away of Rule 4.06. Furthermore, let it be understood that the state must abide by these discovery rules and follow the proper procedures just as the defendant. Every infraction cannot be deemed harmless; however, in this case the error committed was indeed harmless.
AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, PITTMAN and BLASS, JJ., concur.
HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON and SULLIVAN, JJ., dissent.
SULLIVAN, Justice, dissenting:
With the greatest respect for the majority, I find that in spite of its protest, this opinion does, in fact, whittle away at Rule 4.06. To put an end to this jurisprudential erosion, I propose that we stop dealing with these cases on an ad hoc basis.
A recent search determined that since 1979, eighty-six (86) criminal cases involving some form of prosecutorial discovery violation and Rule 4.06 have come before this Court. In these eighty-six (86) instances, we have:
A. reversed because of prosecutorial misconduct in discovery thirty-two (32) times;
B. reversed on other grounds five (5) times; and,
C. affirmed forty-nine (49) times.
In this same time period, we have been faced with eight (8) instances involving defendant's violation of this same discovery rule. In these situations we have:
A. reversed the trial court for excluding defense witnesses and/or evidence three (3) times;
B. affirmed the trial court three (3) times; and,
C. reversed on other grounds twice (2).
Without doubt, the statement was wrongfully withheld from evidence. The irony of this situation is that Officer Williams made this statement available to the prosecution within two weeks of the accident. However, the defense did not learn of the statement's existence until the first day of the trial. In essence, the record reflects that the state failed to comply with the defendant's discovery request.
Just as we maintain that the defendant must request a recess or move for a continuance, the same burden should be placed *1206 on the prosecution. How can we expect the lawyers of this state to take our rules seriously when we fail to do so ourselves?
In light of the prosecution's behavior in this case and because the circuit court erred in excluding the statement from evidence, I would reverse and remand for a new trial.
HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, J., join this dissent.
NOTES
[1] This is only important because the appellant maintains that the fire erupted after Willie's truck collided with Smith's vehicle; therefore, his accident did not cause Willie's death. Not only was there evidence to the contrary, but it did not matter. It was Carraway's negligence that set everything into motion. If Willie had not burned to death, but was killed by one of the exploding .22 rifle shells, we believe that he would still be responsible for Willie's death. Even if Carraway's truck pushed Willie into a river and caused Willie to drown, the appellant then could not point to the river and avoid responsibility. All things considered, his negligence resulted in Willie's death.
[2] On cross-examination the prosecution indicated that none of the officer's pictures was usable, and Williams was unsure if he had taken pictures on the next morning when he returned to the scene. Moreover, the prosecution attacked many of the officer's investigating procedures which surely gave the jury the impression that the officer was either irresponsible or inept. Of course, this adversely affected the officer's credibility.
[3] Williams had obtained information verbally from Smith prior to asking him for written statements. (Vol. III, T. 396).
[4] Three justices dissented because this was a new rule to apply to the state. They believed that by finding that the defendant had willfully violated the discovery rule the state would not have to go through the same procedures that the defendant is required and "this is not even handed justice." (Hawkins, Lee, D., P.JJ., and Sullivan, J., concurring in part and dissenting in part).
[5] This is not to say that we should not strive toward perfection or proceed with the least amount of errors as possible.
[6] In West v. State, 553 So.2d 8, 18 n. 6 (Miss. 1989), we made clear there is no magic words requirement (e.g., "I move for a continuance"), only that the aggrieved party must make a request for the trial to stop.